

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs March 1, 2017

## IN RE: LORENDA B.

**Appeal from the Juvenile Court for Davidson County**
**No. 211759      Sheila Calloway, Judge**

_____

### No. M2016-01841-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights to her minor child. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Davidson County ("the Juvenile Court") seeking to terminate the parental rights of Judith B. ("Mother") to her minor child Lorenda B. ("the Child"). Mother has alleged throughout this case that there is a satanic conspiracy against her and that the Child is at risk of having her organs harvested for trafficking purposes. After a trial, the Juvenile Court terminated Mother's parental rights. Mother appeals to this Court. We affirm the grounds of substantial noncompliance with the permanency plan and mental incompetence, but we reverse the grounds of willful failure to support and persistence of conditions.[1] We also affirm the Juvenile Court's finding that termination of Mother's parental rights is in the Child's best interest. We affirm, in part, and reverse, in part, the judgment of the Juvenile Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed, in Part, and, Reversed, in Part; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Judith B.

Herbert H. Slatery, III, Attorney General and Reporter, and, Alexander S. Rieger, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

John E. Evans, Guardian Ad Litem.

_____

[1] The Child's father's parental rights are not at issue in this appeal, only Mother's.

# OPINION

## Background

The Child was born to Mother in March 2005. DCS became involved in the Child's life in November 2013 because of Mother's alleged erratic behavior and the Child's not receiving sufficient education. The Child was placed with a family for a period of time but that arrangement ended. The Child entered DCS foster care. In June 2014, the Juvenile Court magistrate found the Child dependent and neglected. After a rehearing before the Juvenile Court, the Child in November 2015 again was found dependent and neglected. That order was appealed to Circuit Court, and that appeal was not decided as of the entry of the final order in this parental termination action.

Mother has been evaluated by psychologists on multiple occasions. In 2002, a psychologist who evaluated Mother opined that Mother suffered from "subtle thought disorder" which involves paranoid tendencies. In 2015, two doctors diagnosed Mother with "unspecified schizophrenia spectrum and other psychotic disorder." Two permanency plans were designed for Mother. These plans required Mother, among other things, to obtain a legal source of income and stable housing, undergo a psychological evaluation and follow all recommendations, and, undergo a mental health assessment and follow all recommendations. Initially, visitation was ordered, but this was suspended after the Child allegedly expressed a desire that the visitation cease.

In October 2015, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Child. Trial was held over the course of five days in March and July of 2016. The testimony at trial ranged far afield as to Mother's history and general beliefs. We summarize only the pertinent testimony from key witnesses.

Mother testified. Mother stated that she worked temporary jobs. Mother, once homeless, had lived at an apartment for about six months leading up to trial. Mother receives food stamps. Mother, citing her religious beliefs, refused to take any medication to address her mental health issues. A recurring theme from Mother over the course of trial was her adamant belief that sinister forces threatened her and the Child. Mother testified at trial as follows:

> Q. (By Mr. Perenich) were you ever evaluated for possible medication regarding mental health issues?
> A. At the beginning of this case, there was some sort of an evaluation I would not consider. But, yes, I did cooperate and show up for the appointment.
> Q. Now --

A. I'm not depressed. I don't cry.

Q. No. I'm just asking if you cooperated with the evaluation.

A. I'm not sitting around moping and crying. I don't need antidepressants. I don't want them.

Q. Do you believe that you've completed the permanency plan DCS has set forth for you to do to get [the Child] back?

A. I believe that DCS has taken my daughter prisoner, and I should not have to complete the plan. I believe that I have been denied due process of law in a timely fashion. They failed to do an adequate investigation.

They should have talked with my father and the father of my first two sons who bribed the judge to use a false psych. eval. against me. I think that was a good psych. eval. They discarded it after Jeff bribed the judge, and they replaced it with a faulty one.

I'm not denying that I have need for counseling. But I have sought counsel, and I have found it, and I have been ministered to it, by it. It has been helpful to me. I have received miraculous, medically-documented healing.

Subpoena my doctor, Clarissa Arthur. Ask her about it. Did I receive a miracle, was I really sick, and did I get really well? Yes, I did. So I must be doing something right.

You should be asking me, how did you come from being a satanic ritual abuse survivor who was bleeding to death for years on her cycle and not able to work, to a mom that is able to endure this kind of stress, bear up under it, and still have a good attitude and live with hope and work and be well-respected and well-received and appreciated by many people who know me.

They should be taking notes. Why is it that signs and wonders are following me, and what are those signs saying? Because God has given us grace, and we all need it desperately. And we need to work together, not against each other.

Q. Do you have any concerns about [the Child's] care at the present time in DCS custody?

A. Yes. I have great concern. I feel that God has given us a three-year window to get it together here, to get it right. And if it were to go beyond that, I would fear for her life. I would fear for her becoming a victim of organ trafficking. I have been concerned that there may have been sexual abuse in the [Ms'] home.

There are tangible reasons I can point to that were circumstantial evidences that were extremely upsetting, but I'm not quite as concerned about that. Pardon me?

Q. You said you've got tangible reasons why she might be a victim of sexual abuse?

A. Yeah --

Q. What are those?

A. -- the yeast infection and the doctor's visit. The way DCS responded to the doctor's referral was very inappropriate and distorted. It's very suspicious. Why would they do that? Why would they try to accuse me of coercing the doctor to make a referral? That's absurd. Get the doctor in here to testify.

***

Q. And you are aware that one of the requirements is to see a psychiatrist; correct?

A. Not acutely aware. I mean, I actually probably have skimmed over that assessment, knowing that it is faulty from the foundation up.

Q. So basically no matter what it says, you've felt no obligation to call; am I accurate?

A. I'm not impressed with a foundationally faulty assessment. It's more provoking than it is helpful, and I have tried to spare myself of being provoked.

Q. Do you have any intention of following the recommendations of that assessment?

A. I have every intention of taking good care of my mental, spiritual, emotional health, and my physical health. And I will do whatever it takes to do so. I am well connected with the Most High King, Jesus Christ, and He informs me and points me where to go, how to get what, and I most of the time obediently do it.

Q. I'm going to ask one more time. Do you have any intentions of following the recommendations of the --

A. Not necessarily.

Kirsten Cromie ("Cromie"), a DCS caseworker assigned to the Child's case, testified. Cromie testified that Mother had obtained stable housing. However, according to Cromie, Mother had failed to follow the recommendations from her psychological assessment. Cromie stated that Mother had very strict requirements for accepting a counselor. Mother had discontinued at least one course of counseling because the counselor was not knowledgeable about satanic ritual abuse.

Keionia Ervin ("Ervin"), Mother's supervised visitation worker through LifeCare Services, testified. Ervin testified to an incident during one visit where Mother told the

Child: "Tell them that you don't want your organs to be donated if you are adopted, and, like, whatever the judge decides, like, we hope that she just has the right heart to decide the correct outcome of this case. And if she doesn't, then a higher power will deal with her."

In August 2016, the Juvenile Court entered its final judgment terminating Mother's parental rights. The Juvenile Court found the grounds of willful failure to support, persistent conditions, substantial noncompliance with the permanency plan, and mental incompetence. The Juvenile Court also found that termination of Mother's parental rights is in the Child's best interest. As relevant, the Juvenile Court stated the following in its final judgment:

> 9. DCS became involved with this family in November 2013 due to dependency and neglect based on [Mother's] mental health issues, erratic behaviors and [the Child's] lack of education. DCS conducted a Child and Family Team Meeting in November and determined that Mr. and Mrs. Brandon and Christina [S.] were appropriate placement options. DCS, [Mother] and the [S's] entered into an Immediate Protection Agreement that allowed [the Child] to remain in their home until further proceedings.
>
> 10. On February 13, 2014, the child was placed in DCS custody due to the [S's] no longer being willing to serve as a safety placement. They made that decision based on the inappropriate behavior of [Mother], including her inappropriate conversations with [the Child] and an inappropriate 17 page letter that she sent to the [S's].
>
> 11. The child was adjudicated to be dependent and neglected on April 1, 2014 by the Juvenile Court of Davidson County, Tennessee by Magistrate Melinda Rigsby. The matter was reheard by Judge Sheila D. J. Calloway and the child was again adjudicated to be dependent and neglected. According to the Order of Adjudication, the child was found to be a dependent/neglected child pursuant to T.C.A. §37-1-102(b)(12)(C)(F) & (G) due to the mother failing to have the child enrolled in an appropriate and approved education program and her unaddressed mental health issues which render her unable to properly provide for the child.[2] The child has remained continuously in foster care since February 13, 2014.
>
> 12. DCS filed a petition to terminate both parents' parental rights on October 13, 2015.

---

[2] The decision in that case has been appealed to the Circuit Court. There has been no decision on the appeal.

## Findings of Fact

13. The initial permanency plan dated March 10, 2014 and ratified by the Court on May 20, 2014, required the following of the mother: complete a mental health assessment and follow all recommendations; have a legal source of income; have stable housing; and ensure that [the Child] attends school and participates in classroom activities and assignments.

14. The revised permanency plan dated on February 3, 2015 and ratified by the Court on March 3, 2015, required the following of Mother: complete a mental health assessment and follow recommendations; complete a psychological assessment and follow recommendations; sign a release for DCS to access Mother's mental health records; have a legal source of income sufficient to provide for the mother and [the Child's] needs; notify DCS of any changes in address within 5 days; provide proof of income; have stable housing that is safe and appropriate for mother and [the Child] to reside in; and ensure that [the Child] attends school and participates in classroom activities and assignments.

15. Throughout the time that the child has been in the custody of DCS, there have been reasonable efforts to assist the mother in complying with the requirements of the permanency plan. DCS has assisted the mother in obtaining mental health services through three agencies: Centerstone, Life Cares, and Athena Consulting. Mother has refused to follow through with the recommendations of any of the providers. Mother insists that the providers can not address her issues unless they provide a Christian counselor with a background in satanic rituals. Mother has not given proof of employment although she testified that she is currently employed.

16. [The Child] is currently 11 years old. During her life, she has had very little contact with her father. Her mother continues to have inappropriate behavior and conversations with [the Child]. In fact, during the pendency of these proceedings, the mother sent [the Child] a key to her residence with directions, money and a bus pass so that the child would be able to leave her placement to come and live with her. She has also had numerous inappropriate conversations with the child about her belief that DCS intends to sell the child's body parts once she is placed for adoption.

17. In both plans for [Mother], the tasks were reasonable and related to the conditions that necessitated foster care for the child, and they were tasks that needed to be accomplished in order for the mother to regain custody.

18. As for [Mother], there was a period of time that she was in compliance with some of the requirements of her plan. In fact, the mother

currently has stable housing and employment. However, the mother has not been able to substantially comply with some of the major parts of the permanency plans, particularly the need for her to address her mental health issues and follow all the recommendations.

19. The child was removed from the home February 13, 2014. The Mother's conditions that led to the removal were primarily unaddressed mental health issues. The Father's conditions that led to the removal were abandonment. Nothing has changed since the initial removal because neither parent has done enough to address their issues. Thus, those conditions still persist today, and there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to either parent in the near future. Moreover, continuing the parent-child relationship with either parent greatly diminishes the likelihood of achieving permanency for the child soon.

20. Regarding the best interests of the child, the Court has considered the nonexclusive factors found at T.C.A. §36-1-113(i) and makes the following findings of fact:

a. Neither parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in their home.

b. The mother has failed to effect a lasting adjustment after reasonable efforts where made available by DCS. Furthermore, lasting adjustment does not reasonably appear possible.

c. Father has not maintained regular visitation or other contact with the child.

d. A meaningful relationship has not otherwise been established between the child and the father.

e. A change of caretaker and physical environment is likely to have a negative effect on [the Child's] emotional, psychological and/or medical conditions.

f. The mother's mental and emotional status would be detrimental to the child and prevent her from effectively providing safe and stable care and supervision for the child.

g. Neither parent has been able to consistently support the child financially while she has been in foster care.

h. The child is currently placed in a foster home that wishes to adopt the child and the child has established a strong bond with the foster parents.

Thus, terminating the parental rights of both the Mother and the Father is in the best interest of the child.

(Footnote in original but renumbered). Mother timely appealed to this Court.

**Discussion**

We restate the issues raised by Mother on appeal as follows: 1) whether the Juvenile Court erred in finding the ground of willful failure to support; 2) whether the Juvenile Court erred in finding the ground of persistent conditions; 3) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan; 4) whether the Juvenile Court erred in finding the ground of mental incompetence; and, 5) whether the Juvenile Court erred in finding that termination of Mothers parental rights is in the Child's best interest.[3]

As our Supreme Court instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at

---

[3] The Juvenile Court did not find the ground alleged of failure to provide a suitable home, therefore we need not address it.

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(I)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings."

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[6] Tenn. Code Ann. § 36-1-113(i).

-10-

*Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re: Carrington H.*, 483 S.W.3d at 526-27 (footnote omitted). As such, we review each of the grounds for termination.

Four grounds for termination of parental rights are implicated on appeal. As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

-11-

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2016).

Regarding willful failure to support, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2016).

Regarding substantial noncompliance with the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2016).

As to persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2016).

Finally, regarding the ground of mental incompetence, Tenn. Code Ann. § 36-1-113(g)(8) provides:

The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's

-13-

or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated;

Tenn. Code Ann. § 36-1-113(g)(8) (Supp. 2016).

We first address whether the Juvenile Court erred in finding the ground of willful failure to support. DCS concedes this ground was not proven, stating in its brief that "the trial court failed to render findings of fact that Mother failed to remit the required support during the four-month period and the record does not clearly and convincingly prove as such regardless." From our own review of the review, we agree. The evidence in the record on appeal is not clear and convincing as to the ground of willful failure to support, particularly with respect to the crucial four-month period before the filing of the petition. We, therefore, reverse the ground of willful failure to support.

We next address whether the Juvenile Court erred in finding the ground of persistent conditions. DCS likewise concedes this ground was not proven, acknowledging that there is an outstanding appeal to Circuit Court of the Juvenile Court's dependency and neglect order. This Court previously has stated:

> If the order outlining the conditions that led to the removal of the child, i.e., the dependency and neglect order, is pending appeal, that order is not res judicata. Accordingly, until the dependency and neglect order has reached its "final completion," *Swift v. Campbell*, 159 S.W.3d 565, 573 (Tenn. Ct. App. 2004), either because there has been no appeal, or through the exhaustion of all appellate remedies, we hold that the prior order, which is not res judicata, cannot form the basis, standing alone, for termination of parental rights on any ground that contemplates reliance on a previous finding or order. Because there is no evidence in our record from which we can determine the current posture of Appellant's appeal from the Juvenile Court's order on dependency and neglect, and based upon the foregoing analysis, we conclude that the trial court erred in terminating Appellant's parental rights on the ground of persistence of conditions. Accordingly, we reverse the trial court's termination of Appellant's parental rights on this ground.

*In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *8 (Tenn. Ct. App. Nov. 16, 2015), *no appl. perm. appeal filed*.

Upon review of the entire record, we conclude that the ground of persistent conditions is not established by the requisite standard of clear and convincing evidence. We, therefore, reverse the ground of persistent conditions.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. As opposed to the ground of persistent conditions, we find no case law or statutory language requiring a final prior order on abuse, dependency or neglect in order to establish the ground of substantial noncompliance with the permanency plan.

While Mother maintained a legal source of income, she remains uncooperative in the most significant responsibility of her permanency plan, addressing her mental health issues. Mother's own testimony is that she has refused steadfastly to take any medication for her mental health condition, regardless of whether doctors prescribe it. Mother has put exceedingly strict criteria upon whom she will consent to see for therapy, including her strong desire to find a counselor well-versed in satanic ritual abuse cases. As found by the Juvenile Court, "the mother has not been able to substantially comply with some of the major parts of the permanency plans, particularly the need for her to address her mental health issues and follow all the recommendations." The evidence does not preponderate against this finding. The Juvenile Court found further that: "In both plans for [Mother], the tasks were reasonable and related to the conditions that necessitated foster care for the child, and they were tasks that needed to be accomplished in order for the mother to regain custody." Given the centrality that Mother's mental health issues have in this case, we agree with this assessment of reasonableness as well. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan has been established by clear and convincing evidence. We affirm as to this ground.

We next address whether the Juvenile Court erred in finding the ground of mental incompetence. Mother argues that no substantial harm has been visited upon the Child because of Mother's mental condition. Mother also argues that previous psychological assessments of Mother, in 2002 and 2015, are too remote in time or did not conclude that Mother is incompetent to parent the Child. Mother points out that no expert opinion on Mother's mental health and its impact on her ability to parent the Child was presented at trial.

The standard for this issue has been described as inquiring as to whether "by clear and convincing evidence that the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002), *no appl. perm. appeal filed*. This Court has affirmed this ground, in one instance, where the parent "functioned in such a low range that no amount of training, education, or

-15-

counseling 'could bring him up to the level where he could parent these children.'" *State, Dept. of Children's Services v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008). "[E]xpert testimony on the effect of a parent's mental illness on his or her ability to parent a child is not required." *In re Shaneeque M.*, No. E2014-00795-COA-R3-PT, 2014 WL 6499972, at *9 (Tenn. Ct. App. Nov. 20, 2014), *Rule 11 perm. app. denied Feb. 20, 2015*.

No expert testified at trial as to Mother's mental condition. However, evidence in the record on appeal reflects that on different occasions, Mother has been diagnosed with or shown signs of suffering from "subtle thought disorder," "unspecified schizophrenia spectrum and other psychotic disorder," and anxiety disorder. Apart from those considerations, perhaps the most glaring evidence concerning this issue comes from Mother's own testimony at trial. Mother testified at great length about her concerns over her or the child being victimized by human organ traffickers, satanic conspirators, and other alleged nefarious forces. This is, of course, a free society, and Mother is entitled to her personal beliefs. However, as pertains to the Child's welfare, these beliefs and patterns of thinking have serious ramifications that are of public concern. In our judgment, Mother's untreated paranoia prevents her from making well-founded decisions necessary to successfully parent the Child. To review, DCS became involved in this case in part because of the Child's lack of proper education. Any doctor, teacher, or official or authority of any sort, from Mother's perspective, could be an organ trafficker or satanic occultist in disguise. Were Mother to resume parenting the Child, critical decisions necessary for the Child's welfare likely would be made in this outlandish context.

Moreover, Mother has shown zero genuine inclination toward remedying her mental health issues. In fact, as demonstrated by her own testimony, Mother will not commit to cooperate fully with the recommendations of mental health experts. It is, therefore, unlikely that Mother's mental health issues ever could be rectified to an extent that she could assume responsibility for the care of the Child. We find, as did the Juvenile Court, that the ground of mental incompetence has been proven by clear and convincing evidence. We affirm this ground.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. The Child is doing well in her foster home. While there is evidence of a bond of love between Mother and the Child, this fact is outweighed by the appropriateness of the Child's current placement as opposed to the serious hazards implicit in a return to Mother's care given Mother's ongoing and unresolved mental health issues. We find by the standard of clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Child's best interest.

In summary, we reverse the grounds of willful failure to support and persistent conditions. We affirm the grounds of substantial noncompliance with permanency plan and mental incompetence. We also affirm the Juvenile Court's determination that termination of Mother's parental rights is in the Child's best interest. We, therefore, affirm the Juvenile Court's termination of Mother's parental rights.

## Conclusion

The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Judith B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE